MARK T. SCHOENHOFER, S.C. #15781
1631 E. 1ST STREET
WICHITA, KANSAS 67214
316-262-5400
FAX: 316-262-1787
EMAIL: MYDEFENSEFIRST@YAHOO.COM

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff, | ) | |
| v. | ) | Case No. 6:24-cr-10074-JMK |
| ERIC GONZALEZ GUTIERREZ,<br>Defendant. | ) | |

**MOTION FOR DEPARTURE**

**COMES NOW**, the defendant Eric Gonzalez-Gutierrez, by and through his attorney Mark T. Schoenhofer, and moves this Court for a departure pursuant to U.S.S.G. 5k2.0 to 120 months. In support of his motion, Mr. Gonzalez-Gutierrez (hereinafter Mr. Gonzalez) provides the following bases:

**I. BACKGROUND.**

**Crime of Conviction**.

1) Mr. Gonzalez pleaded guilty to Count 1 of the Indictment, charging a violation of 18 U.S.C. § 841(a)(1), that is, Possession with intent to Distribute Methamphetamine. The offense carries a statutory maximum sentence of twenty (20) years of imprisonment.

**Guideline Provisions**.

The Base Offense level, considering the drug weight is 34. With adjustments for specific offense characteristics, and acceptance of responsibility, the total offense level, as calculated by

USPO Bullock, is 37. Note: the defense objects to the increase in the offense level as calculated by USPO Bullock in paragraphs 26 and 27.

The defendant's criminal history is scored at IV.

Based on a total offense level of 37 and a criminal history category of IV, the guideline range of 292 months to 365 months. The statutorily maximum sentence is 20 years.

**Effect of Plea Agreement**

2) Mr. Gonzalez entered a change of plea pursuant to a plea agreement with the government. Paragraph 5 of the written plea agreement sets forth the government's agreements. In exchange for Mr. Gonzalez' successful change of plea, the government made the following promises:

> *to dismiss the remaining count of the Indictment at the time of sentencing;
>
> *to not file any additional charges against the defendant arising out of the facts forming the basis for the present Indictment;
>
> *to recommend the defendant receive a two (2) level reduction in the applicable offense level under U.S.S.G. § 3E1.1 for acceptance of responsibility. In addition, if his offense level is 16 or greater, prior to any reduction for acceptance of responsibility, and the Court finds he qualifies for a two-level reduction, the United States will move at the time of sentencing for an additional one-level reduction for acceptance of responsibility because he timely notified the government of his intention to enter a plea of guilty;
>
> *and to recommend a sentence at the low end of the applicable Guideline range, though no greater than 188 months, and to allow the defendant to reserve the right to request a downward departure and/or a variance.

**Departures.**

3) The basic theory of the Sentencing Guidelines is a simple one. In order to lessen the degree to which different judges imposed different sentences in comparable cases, an expert Sentencing Commission wrote Guidelines, applicable to most ordinary sentencing situations. *See* S.Rep. No. 225, 98th Cong., 2d Sess. 38, 51, 161 (1984), *reprinted in* 1984 U.S.C.C.A.N. 3182,

3221, 3234, 3344. In an ordinary situation, the statutes and the Guidelines themselves would require the judge to apply the appropriate guideline—a guideline that normally constrains, within fairly narrow limits, the judge's power to choose the length of a prison term. 18 U.S.C. § 3553(a), (b). Should a judge face a situation that is not ordinary, the judge can depart from the Guidelines sentence, provided that the judge then sets forth the reasons for departure. 18 U.S.C. § 3553(b), (c).

**Guidelines are Advisory.**

4) The Federal Sentencing Guidelines are merely advisory, and the Court is not bound by their ranges:

> 18 U.S.C.A. § 3553(b)(1), which makes the Federal Sentencing Guidelines mandatory, is incompatible with today's Sixth Amendment 'jury trial' holding and therefore must be severed and excised from the Sentencing Reform Act of 1984(Act). Section 3742(e), which depends upon the Guidelines' mandatory nature, also must be severed and excised. So modified, the Act makes the Guidelines effectively advisory, requiring a sentencing court to consider Guidelines ranges, see § 3553(a)(4), but permitting it to tailor the sentence in light of other statutory concerns, see § 3553(a). Pp. 757-769.

*U.S. v. Booker*, 125 S.Ct. 738, 743, 160 L.Ed.2d 621 (2005).

5) Pursuant to 18 U.S.C. § 3553(a), the sentencing judge is to consider (1) offense and offender characteristics; (2) the need for a sentence to reflect the basic aims of sentencing; (3) the sentences legally available; (4) the Sentencing Guidelines; (5) Sentencing Commission policy statements; (6) the need to avoid unwarranted disparities; and (7) the need for restitution. See *Rita v. United States*, 551 U.S. 338, 338, 127 S.Ct. 2456, 168 L.Ed.2d 203 (2007).

6) Mr. Gonzalez submits that his case presents extraordinary factors, and imprisonment for a term contemplated by the guideline range and as prescribed by statute is "greater than necessary" to achieve the purposes of sentencing set forth at 18 U.S.C. § 3553(a). Indeed, there exists mitigating circumstances of a kind, and to a degree, not adequately taken into

consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that prescribed. 18 U.S.C. §3553 and U.S.S.G. §5K2.0.

**Flexibility and Discretion Possessed by the District Courts**.

7) For years, federal courts have recognized that the Guidelines "do not displace the traditional role of the district court in bringing compassion and common sense to the sentencing process . . . In areas where the Sentencing Commission has not spoke . . . district courts should not hesitate to use their discretion in devising sentences that provide **individualized justice**." (Emphasis added.) *United States v. Williams*, 65 F.3d 301, 309-10 (2nd Cir. 1995).

8) A 3rd Circuit panel explained, "departures are an important part of the sentencing process because they offer the opportunity to ameliorate, at least in some aspects, the rigidity of the Guidelines themselves", and urged that "[d]istrict judges, therefore, need not shrink from utilizing departures when the opportunity presents itself and when circumstances require such action to bring about a fair and reasonable sentence." *United States v. Gaskill*, 991 F.2d 82, 86 (3rd Cir. 1993).

9) The *Gaskill* panel referred to its opinion in *United States v. Lieberman,* 971 F.2d 989, 999 n. 10 (3d Cir.1992), noting that "an impressive array of commentators has recently emphasized the importance of the flexibility and discretion possessed by the district courts in using their departure power to arrive at sentences that are consistent with the purposes underlying the Sentencing Reform Act.' We referred to Professor Freed's discussion in the Yale Law Journal, as well as articles by Chief Judge Donald P. Lay, *Rethinking the Guidelines: A Call for Cooperation,* 101 Yale L.J. 1755 (1992), and Marvin E. Frankel, *Sentencing Guidelines: A Need for Creative Collaboration,* 101 Yale L.J. 2043 (1992)." *Id.*

10) Mr. Gonzalez offers this Court several departure bases, warranting a departure sentence of 10 years (120 Mos.). Mr. Gonzalez submits that such a term of imprisonment is consistent with the intent of 18 U.S.C. § 3553(a), i.e., "a sentence sufficient, but not greater than necessary to comply with the purposes [of sentencing]."

11) Section 5K2.0 of the Sentencing Guidelines provides this Court with discretion to depart from the applicable Guidelines range if "'there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described.' " U.S.S.G. § 5K2.0, p.s. (quoting 18 U.S.C. § 3553(b)). These are the mitigating bases justifying departure in Mr. Gonzalez's case:

**II. DEPARTURE BASES**:

**Basis 1. Extraordinary Family Situation and Responsibilities.**

i. <u>Family dynamics</u>

12) Mr. Gonzalez has two minor children, Eric Jr. (10 years old) and Eva (11 years old), who rely on his financial assistance. Additionally, he provides around the clock care for his younger brother Israel, who suffers from a severe intellectual disability. Since the passing of his mother, the care of Israel has passed to Mr. Gonzalez and his father. Mr. Gonzalez's father is elderly, and each day, is less and less capable of caring for Israel. Mr. Gonzalez has also spent the last 20 years raising his nephew Alan Gonzalez-Gutierrez, Jr..

13) Mr. Gonzalez worked for thirteen years for Wildcat Construction. When his mother fell ill, Mr. Gonzalez left his employment. Mr. Gonzalez quit his job to help take care of his mother and his brother Israel, as family is the highest of priorities to Mr. Gonzalez.

14) Mr. Gonzalez was arrested on Father's Day, June 16, 2024. Early that morning, Mr. Gonzalez drove to his father's house and picked up his brother Israel. He then took Eric, Jr. and Israel swimming. Along with friends, Mr. Gonzalez, Eric, Jr. and Israel swam for hours at an apartment complex. They all then drove from the pool to Mr. Gonzalez's house to grill out. It was at his house that Mr. Gonzalez's plans were destroyed and his life changed forever.

15) When Mr. Gonzalez arrived home, Aron Lara and 15-20 other PFL gang members were outside a house across the street. Three of the gang members were armed with handguns. All of the gang members were drinking and rampageous. The gang members walked across the street in front of Gonzalez' house, surrounding Gonzalez and his friends. The gang began threatening Gonzalez and his friends. Lara told one of Gonzalez's friends that he wanted him selling drugs for him again. The friend refused. Gonzalez tried to calm a tense situation, reminding everyone that it was Father's Day. Lara told Mr. Gonzalez that he would shoot up his house without regard for the children inside. Gonzalez knew how dangerous Lara was, as he had previously attacked Gonzalez at a music concert without warning or justification, leaving Gonzalez cut up and bloodied.

16) Despite attempts by Gonzalez and his two friends to de-escalate the situation, the gang members were growing more rumbustious and threatening. Seeing one of the gang members pull out his gun, Gonzalez went inside house, and later came back outside with an AR style rifle. One of the gang members discharged his handgun without warning and struck Javier Navarette -- Gonzalez's friend. Gonzalez returned gun fire, striking Lara several times. Gonzalez then ran inside and gathered his son, his brother, and Cynthia Romero, and left in a car. Gonzalez then drove away as quickly as he could, while gang members continued to shoot at them, striking the car with several bullets. Lara collapsed in the street and died.

17) The gang immediately began exacting revenge on Gonzalez. They destroyed the backside of Gonzalez' house by setting it on fire. They offered a $50,000 reward for the head of Gonzalez. Gang members stopped Gonzalez's friends, held them at gunpoint and threatened to kill them if they didn't turnover Gonzalez. Gonzalez fled the country to escape the gang's retribution.

18) Police investigated the death of Mr. Lara. Officers received a search warrant for Gonzalez's house to look for the firearm. Inside Gonzalez' house, police found a .556 caliber rifle, ammunition, a magazine, and the narcotics that are the subject of this indictment. On June 20, 2024, Mr. Gonzalez was charged in SG-2024-CR-001196 with First Degree Murder and Criminal Possession of a Firearm. On July 9, 2024, a federal indictment was returned in this case. On October 22, 2024, in SG-2024-002134, the state of Kansas charged Mr. Gonzalez with one count of Offender Registration Violation. On October 31, 2024, Gonzalez was arrested.

19) Based on a defense motion for a probable cause hearing on immunity determinations, the Sedgwick County District Court held Mr. Gonzalez was statutorily justified in the use of force, and is immune from criminal liability for the death of Aaron Lara. The Court concluded that Gonzalez acted both in self defense and defense of others. Mr. Gonzalez later entered a plea of guilty to the offender registration violation, and is awaiting sentencing in that court.

20) After Mr. Gonzalez entered his plea guilty to the registration violation, the government obtained jurisdiction over Mr. Gonzalez pursuant to an order granting motion for Writ of Habeas Corpus ad prosequendum. Two months later, Mr. Gonzalez entered his change of plea in this case. (ECF Docs. 6, 21.)

21) Mr. Gonzalez accepts full responsibility for his criminal conduct. He does not intend to minimize the seriousness of his offense in making the following arguments. However, it is important to recognize that his criminal conduct occurred against a backdrop of intense caregiver demands and financial/emotional strain. This does not excuse the offense, but it meaningfully explains how an otherwise law-abiding caregiver made a grave mistake. Quitting his job of 13 years to help his mother and his disabled brother left Gonzalez without the financial means to meet his monetary obligations.

22) Mr. Gonzalez's family situation is extraordinary, and certainly forms the basis for a departure. Israel, Eric, Jr. and Eva all rely on Mr. Gonzalez' assistance, and will suffer financially and from adult care. And Israel will be deprived of essential on-hands care and protection when Mr. Gonzalez is sent to prison, as Alan, Jr. has planned for some time to leave the house to attend college.

ii. Case law supporting a departure on this basis

23) The Federal Sentencing Guidelines instruct that family circumstances and responsibilities are a permissible but a discouraged factor for departure. *See USSG* § 5H1.6. A district court may depart based on family circumstances "only if the factor is present to an exceptional degree or in some other way makes the case different from the ordinary case where the factor is present." *Koon v. United States*, 518 U.S. 81, 94, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996).

24) ***United States v. Gauvin.***

In *United States v. Gauvin*, 173 F.3d 798 (10th Cir. 1999), when addressing the "exceptional degree" issue, the Tenth Circuit panel reflected:

> It may be, as Tolstoy suggested, that happy families are all alike and every unhappy family is unhappy in its own way—but how to

> distinguish between unhappys? "[W]hen is a case so 'unusual' that it is a candidate for departure? The Supreme Court in *Koon* made clear that this question is largely for the district court to answer." *Collins*, 122 F.3d at 1302. For example, is the case of a defendant's imprisonment resulting in her children being cared for by a drug-abuser better or worse than the instant case, where the defendant's imprisonment leaves his children almost completely unsupervised? That is, is a drug-abusing supervisor better than no supervisor at all? And, what sort of "special relationship" with a lover's son is required for the imprisonment to become too great a hardship? If, instead of an impending threat of *relapse* into psychological problems, there were no psychological problems, but just a threat of depression, would that be better or worse?

173 F.3d at 807.

25) Quoting a Seventh Circuit case, the *Gauvin* panel emphasized that the "district court judge may have a better feel for what is or is not unusual or extraordinary and that when a district court clearly explains the basis for its finding of an extraordinary family circumstance, that finding is entitled to considerable respect on appeal." 173 F.3d at 807.

26) In *Gauvin*, the defendant was convicted by jury for assault with a dangerous weapon in Indian Country, in violation of 18 U.S.C. §§ 1153, 113(a)(3), and assault on a federal officer, in violation of 18 U.S.C. § 111(b). *Id*., 173 F.3d at 801. The district court granted Mr. Gauvin a three offense-level downward departure because of exceptional family circumstances. 173 F.3d at 806.

27) The Court found that *Gauvin* supported 4 young children. Since he had been taken in custody, Gauvin's wife had to work 14 hour days to replace his income. The work was 55 miles from her home; so, she was away from home sixteen hours a day. The Court found that even working 14 hour days, the children were barely provided for financially, and unprovided for parentally. The Navajo Housing Authority began conducting an investigation to determine whether Mrs. Gauvin would be permitted continued custody of her children. Mrs. Gauvin also

was at risk of losing her car for failure to make payments, which would prevent her from being able to work. 173 F.3d at 808. A similar circumstance would no doubt result from Mr. Gonzalez being sent to prison for an extended period. While Mr. Gonzalez's children live with his ex wife and her husband. Mr. Gonzalez' father is now 70 years old, and the only earner for himself, Israel and Alan.

28) ***United States v. Pena***.

In *United States v. Pena*, 930 F.2d 1486 (10th Cir. 1991), the defendant—Irma Pena--was convicted of possession with intent to distribute less than 50 kilograms of marijuana. Ms. Pena was a single parent of an infant, and the sole support of a sixteen year old daughter and that daughter's infant. The presentence report specified a guideline range of 27- 33 months in prison. Based on what the court termed "unique family responsibility", it granted Ms. Pena a downward departure to probation for a term of five years, with a special condition of probation being that she serve six months in a community treatment center. 930 F.2d at 1489.

29) The Court reasoned:

> I find that the Defendant's unique family responsibility warrants a departure to the established guideline range of 27 to 33 months, for special circumstances. Mainly, that the Defendant is a single parent of a two-month old child and is the sole support for herself and her infant child. In addition, she has been steadily employed for a long time and is providing for the financial support of her 16–year old daughter who, herself, is a single parent of a two-month old child. Therefore, should the Defendant be incarcerated for an extended period of time, two infants would be placed at a potential risk. Defendant has no prior record of drug abuse, nor other felony criminal convictions and has held long-term employment. She poses no threat to the public and would be justly punished, sufficiently deterred and adequately rehabilitated by a **sentence** of probation with community confinement as a special condition. Accordingly, a downward departure to a term of probation is appropriate as the Defendant does not now need to be incarcerated to protect the public from other crimes.

30) Like *Pena*, Mr. Gonzalez is the only capable family member to care for his brother Israel when his father finally becomes unable to provide such care and when Alan leaves for college.

31) ***United States v. Owens.***

In *United States v. Owens*, 145 F.3d 923 (7th Cir. 1998), the Seventh Circuit affirmed a downward departure from a level 32 (169 to 210 months) to 120 months under 5H1.6 for the defendant (who was convicted of possession of crack cocaine with intent to distribute), because "he maintained a good relationship with his [three] children"; he spent time everyday with his brother who suffered from Down Syndrome, and; his common law wife testified she might have to move to public assisted housing and receive welfare benefits. The District Court held that the defendant's situation differed from that of the typical crack dealer in that the defendant takes an active role in raising his children and supporting his family. Mr. Gonzalez was actively involved in raising his children, spending a large amount of time loving and caring for them. He was a care-taker and loving brother of Israel. Gonzalez is no ordinary drug dealer. He took an active role in building up, protecting and caring for family.

32) ***United States v. Galante.***

As in *Owens*, the Second Circuit in *Galante* affirmed a District Court's departure in a drug case from 46-57 months to 8 days, where the Defendant showed he was a conscientious and caring father of two sons who would have faced severe financial hardship. *United States v. Galante*, 111 F.3d 1029 (2d Cir. 1997).

33) In *United States v. Rivera*, 994 F.2d 942 (1st Cir. 1993), the First Circuit Court mused:

> It may not be unusual, for example, to find that a convicted drug offender is a single mother with family responsibilities, but, at some point, the nature and

> magnitude of family responsibilities (many children? with handicaps? no money? no place for children to go?) may transform the "ordinary" case of such circumstances into a case that is not at all ordinary. Thus, a sentencing court, considering whether or not the presence of these "discouraged" factors warrants departure, must ask whether the factors themselves are present in unusual kind or degree.

994 F.2d at 948.

This is the conundrum this Court is faced with. Mr. Gonzalez has two young children, who rely on him for emotional, financial, and educational support[1]. Mr. Gonzalez's brother is seriously mentally handicap, and needs daily care and protection. Without Mr. Gonzalez, Israel will in the near future be without a family member to help. Mr. Gonzalez's family life is not ordinary. Rather, it is outside the heartland. Gonzalez made the fatal error of thinking that he could spend full time with his family while dealing in narcotics for additional income. While such a fatal mistake carries drastic consequences, the defendant is not an ordinary drug dealer. He is a loving family member. He is caring father, loving brother, and a genuinely good human being.

34) ***United States v. Johnson.***

In *United States v. Johnson*, 964 F.2d 124, 128-30 (2nd Cir. 1992), the defendant was a single mother responsible for three young children and a child of her institutionalized daughter. The Second Circuit panel held that extraordinary family circumstances were justified a 13-level downward departure. <u>The departure was granted not because the defendant had lesser culpability, but because "we are reluctant to wreak extraordinary destruction on dependents who rely solely on the defendant for their upbringing.</u>" (emphasis added.) Mr. Gonzalez is hopeful

[1] Mr. Gonzalez helped raise his nephew Alan Gonzalez Gutierrez, Jr. He did so because Alan, Jr.'s father –Mr. Gonzalez's older brother—was deported. Alan, Jr. excelled in school and was given a scholastic scholarship to college. Because of Gonzalez' arrest, Alan Jr. had to put off college to help Israel while Gonzalez is in prison. Alan deserves to go to college, and is hopeful that Gonzalez's sentence will be no more than 120 months.

that this Court will recognize the extraordinary destruction that a lengthy sentence will wield on Eric, Jr. , Eva, Israel, Alan, Jr., and his father.

35) The *Johnson* Court referred to another case, with facts not too different from the facts at hand here:

> Such extraordinary family circumstances were present in *United States v. Alba*, 933 F.2d 1117 (2d Cir.1991). There, the defendant and his wife cared for their four- and eleven-year-old daughters and the defendant's disabled father and paternal grandmother. Noting the special situation of this “close-knit family whose stability depends on [the defendant's] continued presence,” we let stand the sentencing court's finding that “incarceration in accordance with the Guidelines might well result in the destruction of an otherwise strong family unit” and its conclusion “that these circumstances were sufficiently extraordinary in this case to support a downward departure.” *Id.* at 1122.

964 F.2d at 129.

As in the *Alba* case, Mr. Gonzalez shares custody with his children’s mother. These children have been without their father for 2 years, and will likely be without him for additional years. But, Gonzalez’s absence affects more than just his children. Mr. Gonzalez is a caretaker of his disabled brother Israel. As in Alba, here too, there is a “close-knit family whose stability depends on [the defendant's] continued presence.” With the passing of his mother, and the advanced age of his father, Mr. Gonzalez soon will be the only family member able to care for Israel. Lengthy incarceration in accordance with the Guidelines will no doubt result in the destruction of an otherwise strong family unit here.

36) ***United States v. Colp***.

In *United States v. Colp*, 249 F. Supp. 2d 740, 745 (E.D. Va. 2003), the defendant pled guilty to one count of income tax evasion. The court departed from the guideline range of 10-16 months to probation because of extraordinary family circumstances. Specifically, the defendant was the sole caretaker of her disabled husband who suffered from a brain injury. The Court held

that "any period of incarceration" here would "serve as an undue hardship on Mr. Culp." Here, Mr. Gonzalez prays only for a departure to 120 months—not an escape from prison. Such a sentence is sufficient but not greater than necessary to meet the goals of sentencing, given Gonzalez' history of extraordinary care-giving for his disabled brother, his love and care for his children, his acceptance of responsibility and his deep regret and heartfelt remorse for putting his family through this ordeal.

**Basis 2. Vulnerability to Victimization in Prison**.

37) In *Koon v. United States*, 518 U.S. 81, 111, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996), the United States Supreme Court expressly recognized that a sentencing court may consider susceptibility to abuse in prison as a factor for a downward departure in extraordinary or unusual circumstances. This is not an argument that Mr. Gonzalez because of his diminutive stature, his race, or his crime will be targeted for abuse in prison. Rather, he faces the wrath and revenge of the PFL.

38) Since the shooting death of Mr. Lara, PFL gang members have threatened Mr. Gonzalez's life. The gang members have caused substantial damage to his house through arson. These gang members have stopped and threatened friends in an attempt to locate Mr. Gonzalez. The PFL gang have placed a $50,000 bounty on Gonzalez' head. The PFL have made it known they want Eric Gonzalez dead.

39) Prisons are filled with gang members. Mr. Gonzalez is at serious risk of death or great bodily injury when going to prison. It will take no time at all for the word to travel through the prison pipeline that PFL want Gonzalez dead. One attack has already occurred on Mr. Gonzalez since his arrest-- in the Sedgwick County Jail. The injuries to Gonzalez were significant. See Photos below.





Mr. Gonzalez suffered the following injuries from that attack: left orbital floor fracture; left medial orbital wall fracture; bilateral nasal bone fractures-ethmoid and maxillary most sinus; bilateral forehead bruises; swelling to upper and lower left eyelids; ecchymosis and tenderness to

eyebrow and periorbital area; bruising to chest, shoulders and left arm. The above photos were taken more than a week after the attack.

40) The vulnerability to victimization in prison is not just an argument or a fantastic notion, it's a reality. It happened once, and the only questions now are when will the next attack occur, and how bad will it be?

**Credit for Time Served.**

41) Mr. Gonzalez has been in custody since October 30, 2024. See warrant return below:

ELECTRONICALLY FILED
2024 Oct 31 AM 9:50
CLERK OF THE SEDGWICK COUNTY DISTRICT COURT
CASE NUMBER: SG-2024-CR-001196
PII COMPLIANT

IN THE 18TH JUDICIAL DISTRICT FOR THE STATE OF KANSAS,
SEDGWICK COUNTY, KANSAS

**WARRANT RETURN**

I received this warrant: SG2024CR001196 , WT NO. 8189 , issued on 07/02/2024
and executed the same by taking
GONZALEZ-GUTIERREZ, ERIC
into custody on 10/30/2024 14:14

Serving Officer: Mathias, Kyle Leon

1939

Officer Signature

SCSO

Officer Agency

42) Mr. Gonzalez was arrested on a state warrant, for conduct that led to charges in Sedgwick County District Court and to the indictment here. Gonzalez was indicted for drugs discovered during the search warrant on June 20, 2024. That warrant was issued after Mr. Gonzalez shot and killed a man-- who with other gang members-- attacked Gonzalez and his friends. Police were looking for Gonzalez's gun, and discovered narcotics during a house search.

Gonzalez has been in custody since his arrest on October 30, 2024 for both state charges and federal charges. He is entitled to full credit for time served since his arrest of October 30, 2024. This court has authority under U.S.S.G. § 5G1.3 to adjust a federal sentence for time served by the defendant while being held in jail on a state offense, if the jail credit in this case is less than 23 months.

**Basis 3. Post Offense, Post Conviction, Post Sentence Rehabilitation.**

43) Mr. Gonzalez has availed himself of every self improvement, on-line course, and job opportunity available in jail. Mr. Gonzalez earned a role as trustee in the Sedgwick County jail, and was a well behaved inmate there. He is now working a job in the Butler County jail in the kitchen. Gonzalez is working towards his high school degree in Butler County, and he is attending a drug treatment program offered by SACK in the jail. He spends his time productively, improving himself, serving others, and trying to amend for his past offenses. Indeed, for two years Mr. Gonzalez has used his incarceration to improve himself, while other inmates have become bitter and defiant. Mr. Gonzalez's choice reflects his true character.

44) ***United States v. Jones*.**

The Tenth Circuit's decision in *United States v. Jones*, 158 F.3d 492, 502–03 (10th Cir. 1998) supports a decision to depart based on all of Mr. Gonzalez's post offense, post conviction and post sentence rehabilitation efforts. In *Jones*, the Government argued that this specific "factor is not a permissible ground for departure under Tenth Circuit precedent, and that the Sentencing Guidelines have already taken such efforts into account under the acceptance of responsibility guideline."

The Government relied on the Tenth Circuit case of *United States v. Ziegler,* 39 F.3d 1058 (10th Cir. 1994) and its progeny, to argue that post-offense rehabilitation "is an improper

ground for departure beyond that authorized by the acceptance of responsibility provision" of the Guidelines. The *Jones* Court did not mince words in pointing out the error of the government's arguments:

> However, another panel of this court recently determined our decision in *Ziegler* was "effectively overruled by *Koon.*" *United States v. Whitaker,* 152 F.3d 1238, 1241, 1998 WL 480091, *1 (10th Cir.1998). The Supreme Court's holding in *Koon* makes it clear the district court has the authority to consider post-offense rehabilitation as a basis for downward departure. *Koon,* 518 U.S. at 94-96, 108-09, 116 S.Ct. 2035 (holding district court may consider any factor not specifically prohibited by the Sentencing Guidelines); *see also United States v. Sally*, 116 F.3d 76, 80 (3d Cir.1997) (holding downward departure may be warranted by exceptional post-offense rehabilitation efforts); *United States v. Brock,* 108 F.3d 31, 34 (4th Cir.1997) (overruling, in light of *Koon,* earlier holding that post-offense rehabilitation can never be the basis of departure).

*Id*., 158 F.3d at 502-03.

The *Jones* Court instructed:

> The Sentencing Guidelines have taken post-offense rehabilitation efforts into consideration. *See* U.S.S.G. § 3E1.1, comment. (n.1(g)). One of the "appropriate considerations" in determining whether a defendant qualifies for the acceptance of responsibility reduction is post-offense rehabilitation, including counseling or drug treatment. *Id.* (n.1). When an encouraged factor has been taken into consideration by the Guidelines, it may serve as the basis for departure only when present to some "exceptional degree." *Collins,* 122 F.3d at 1303. However, we remain mindful of the fact that the district court is better situated to make this determination and is, therefore, entitled to "great deference on review." U.S.S.G. § 3E1.1, comment. (n. 5).

158 F.3d at 503.

According to the 10th Circuit, the district court "specifically noted Mr. Jones had 'scrupulously followed the conditions of release,' including refraining from contact with Ms. Begay, his estranged wife. Mr. Jones had 'worked regularly,' supported his three children, and had daily contact and regular consultations with a psychologist, resulting in a 'significant improvement in [Mr. Jones'] understanding and attitude.'" *Id.*

The district court found that Jones "changed both his 'attitude and conduct' during his post-arrest release." *Id*. The Court concluded that Jones' post arrest improvement was "significant", and the Court departed from the guidelines in sentencing him. The 10th Circuit held that "fact-based assessment of whether Mr. Jones' post-offense rehabilitation efforts are exceptional falls squarely within the realm of the district court's 'special competence.'" *Koon,* 518 U.S. at 99, 116 S.Ct. 2035. The 10th Circuit held that the "record supports the district court's finding Mr. Jones' efforts were atypical," and the "district court did not abuse its discretion relying on Mr. Jones' post-offense conduct as a basis for its downward departure." *Id.*

Here, Mr. Gonzalez will be presenting letters from various individuals which will reflect on his significant rehabilitative efforts and improvements, and his change in attitude and conduct. Not only has Gonzalez been working in jail, earning a position of trustee, but he is working on his high school degree, he has been attending drug treatment, and he has been calling his family every day. In short, he has undergone a complete metanoia. Gonzalez has experienced nothing short of a profound, transformative change of heart, a conversion, and a complete fundamental shift in his worldview and way of life. Gonzalez has children, an elderly father, a handicap brother and a nephew who needs his help. He deeply regrets letting his family down in such a critical way. He knows he deserves punishment, but he already lives daily suffering a deep, relentless, soul shaking torment, which transcends any suffering that prison alone can inflict. This is why he has been working so hard to repay his family for his offenses.

This factor alone and in combination with all of the other mentioned factors warrants a departure to 120 months.

**Defendant's Medical Condition**.

Mr. Gonzalez was diagnosed with and treated for testicular cancer. The cancer has spread to his leg. Out of fear the treatment was not effective, Mr. Gonzalez never followed up with his doctor to see if the cancer was eradicated. A departure based on the daunting prospect that Mr. Gonzalez may be serving prison while suffering the slow languishing effects of cancer is appropriate.

---

**IV. CONCLUSION**.

When considering these bases for departure -- all listed above — this case clearly falls outside the heartland of cases. Mr. Gonzalez prays for a departure to an offense level of 29 with a criminal history of IV and a sentence of 121 months, with credit for all of the time he has been in custody since his arrest of October 30, 2024.

**WHEREFORE**, Mr. Gonzalez prays for a departure in conformity with the above request.

Respectfully submitted,

/S Mark T. Schoenhofer, Attorney
Mark T. Schoenhofer, #15781
1631 E. 1st Street
Wichita, Kansas 67214
316-262-5400
Fax: 316-262-1787
Email: mydefensefirst@yahoo.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that he electronically filed the foregoing motion and/or departure and/or variance and Exhibits with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to counsel of record.

/S Mark T. Schoenhofer, Attorney
Mark T. Schoenhofer, #1578